UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

01 AUG -3 PM 2: 38

.. ...... COURT
N.D. OF ALABAMA

ANITA M. LAKE,                    }
                                  }
        Plaintiff,                }
                                  }
v.                                }        CASE NO. CV 99-B-3429-S
                                  }
EASTERN HEALTH SYSTEM, INC.       }
and HEALTH SERVICES EAST, INC.    }
                                  }
        Defendants.               }

**ENTERED**

AUG 3  **2001**

## MEMORANDUM OPINION

Currently before the court is Defendants' Motion for Summary Judgment filed by Eastern

Health System, Inc. ("Eastern") and Health Services East, Inc. ("Health Services East").[1]

Plaintiff Anita M. Lake ("Lake" or "plaintiff") brings this action pursuant to the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* and the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* Upon consideration of the record, the

submissions of the parties, the arguments of counsel, and the relevant law, the court is of the

opinion that defendants' Motion is due to be granted.

### I.   FACTUAL SUMMARY

A.    **Plaintiff's Employment with Lakeview**

Lake was employed by Health Services East as the Administrator of Lakeview Nursing

Home ("Lakeview") from 1986, until her termination in June 1997.  (DX[2] 2 at 8, PX 1 at 76-78.)

---

[1]  Eastern and Health Services East will be collectively referred to throughout this
Memorandum Opinion as "defendants."

[2]  Eastern and Health Services East filed Defendants' Evidentiary Submission in Support
of Defendants' Motion for Summary Judgment on January 5, 2001.  This evidence will be



Health Services East is a subsidiary of Eastern.  (DX 3 at 9.)

As the Administrator, Lake was the top manager at the Lakeview facility, responsible for overseeing the entire operation of and all departments at the facility.  (DX 2 at 79-80.)  Lake reported to Mary Mann ("Mann"), the Vice President of Older Adult Services for Health Services East, who was responsible for several other facilities and programs and was physically located at another facility.  (DX 2 at 79; DX 3 at 17; DX 5 at 13-14.)

**B.      The Union Organization Campaign**

On February 17, 1997, Lakeview received notice that the United Food and Commercial Workers ("the union") was trying to organize Lakeview's nursing assistants, dietary aides, and housekeeping staff, a group of approximately thirty to thirty-five employees.  (DX 2 at 84, 89-90; DX 4 at 46.)  When alerted to the union organizing, Katie Chamblee ("Chamblee"), the Eastern Vice President of Human Resources, and Mike McKelvaine ("McKelvaine"), the Human Resources Manager, spent a significant amount of time at Lakeview, assisting Lake in opposing the union campaign.  (DX 2 at 96; DX 3 at 7-8, 23; DX 4 at 21-23, 40-41, 72.)

With the assistance of Chamblee and McKelvaine, Lakeview responded to the union campaign with its own campaign to educate employees about the value of their benefits and the procedures in place to assure their fair treatment.  (DX 4 at 38-41; DX 1 at ¶ 3.)  Because Lake was the top manager at the facility, Lake conducted the initial meeting with employees to discuss the union.  (DX 2 at 90-93; DX 4 at 40-41.)  According to Chamblee and McKelvaine, however,

---

referred to throughout this Memorandum Opinion as "DX," followed by the corresponding tab number.  Lake filed Plaintiff's Evidentiary Submission in Opposition to Summary Judgment on January 26, 2001.  This evidence will be referred to throughout this Memorandum Opinion as "PX," followed by the corresponding tab number.

Lake exhibited discomfort communicating with her employees and had difficulty establishing any rapport in the meeting.  (DX 1 at ¶ 11; DX 4 at 47-51.)

In responding to the union campaign, Lakeview's initial objective was to determine what issues concerned the employees and led to the union organization in the first place.  (DX 1 at ¶ 4.)  Although Lake met with the employees to solicit their concerns and questions, she does not recall any issues raised by the employees.  (DX 2 at 92.)  According to Lake, those employees who had problems or concerns did not express them to her, but shared them with Chamblee and McKelvaine instead.  (*Id.* at 94.)

While at the facility during the campaign, Chamblee and McKelvaine learned that the employees' primary concerns revolved around inconsistent treatment of employees and poor communication between the management staff and the employees.  (DX 1 at ¶¶ 5, 8, 15; *see also* DX 2 at 101-02; DX 4 at 46.)  Specifically, the employees were upset because management would make decisions and either not communicate them at all to the employees or not sufficiently explain the basis for the decisions.  (DX 1 at ¶ 5.)  Chamblee believed the failure to communicate resulted in confusion and resentment by the employees.  (*Id.*)  Many of the employees believed that management was inconsistent in its treatment of the employees, which led them to conclude that management "played favorites" or, even worse, discriminated on the basis of race.  (*Id.*)

For example, employees were unhappy because work schedules were posted and then later changed without notice.  (DX 1 at ¶ 6; DX 3 at 38-39; DX 4 at 57.)  An employee told Chamblee that after the holiday schedule had been posted and the employees had made personal plans accordingly, the schedule was withdrawn and completely redone without explanation.  (DX

3

1 at ¶ 6.)  The employees were upset by this, and one employee submitted a written complaint to Lake concerning the situation.  (*Id.*)  When Chamblee asked Lake about this during the union campaign, she pulled the written complaint out of her desk, having never responded in any way to the employee.  (*Id.*)  Chamblee believed that Lake's actions and inaction not only left employees feeling that they had been treated unfairly, but also that they had no effective means of addressing problems and complaints with management.  (*Id.*)

Lakeview employees also complained that they were often not paid on time for scheduled time off.  (DX 4 at 58-59.)  According to the employees, Lakeview management made obtaining pay for scheduled time off needlessly cumbersome by requiring them to obtain multiple administrative approvals.  (*Id.*)  These approvals often were not completed on a timely basis, leaving the employees without pay for scheduled time off.  (*Id.*)

During the campaign, nursing assistants complained to Chamblee about the manner in which they were supervised.  (DX 1 at ¶ 7; *see also* DX 2 at 125-26.)  They were supervised by Licensed Practical Nurses ("LPNs"), who, although clinically competent, had no management training.  (DX 1 at ¶ 7.)  "The LPNs were abrupt in giving directions and, from the nursing assistants' perspective, treated them like children (e.g., demeaning tone of voice, pointing fingers)."  (*Id.*)  When Chamblee and McKelvaine addressed these issues with Lake, she had difficulty understanding the problem and simply noted that the LPNs' directions were technically correct, without acknowledging the impact of their poor management style on employee morale.  (DX 1 at ¶ 7; DX 2 at 125-126.)

Employees also complained that supervisors treated them inconsistently.  (DX 1 at ¶ 8; *see also* DX 4 at 34-36, 44-45, 57-58.)  Supervisors would allow some employees more leniency

4

in the application of rules because of the supervisor's assessment that one employee was a better employee than another. (*Id.*) The employees perceived this disparity in treatment to be favoritism at best and race discrimination at worst. (DX 1 at ¶ 8.) When Chamblee raised this issue with the managers, the managers at Lakeview did not appreciate the negative impact their actions created on the employees' perception of management, whether correct or not. (*Id.*)

The remarks of management staff also contributed to the employees' perception of race discrimination. (DX 1 at ¶ 9; *see also* DX 2 at 39-41; DX 4 at 41-45, 61-62.) For example, the Director of Housekeeping on occasion referred to employees as "you people," which some black employees perceived as having a racial connotation. (DX 1 at ¶ 9.) When Chamblee and McKelvaine addressed this issue with Lake, she responded, "that's just the way he is." (*Id.*) Whether or not the Director of Housekeeping intended a racial connotation, the perception alone was a significant concern to Chamblee during the campaign. (*Id.*)

Employees also complained about smaller issues, which were nevertheless important to the employees. (DX 1 at ¶ 10.) For example, many employees had a strong aversion to drinking out of the same glasses which were used by Lakeview residents. (DX 1 at ¶ 10; DX 4 at 52-54.) Although the glasses were properly washed, the employees had very strong feelings about using the same glassware. (*Id.*) Lake removed the styrofoam cups previously used by the employees because of budget concerns and began requiring employees to use the residents' glassware. (*Id.*) The cost savings, however, was minor relative to the employee discontent it created. (*Id.*) During the campaign, McKelvaine brought cups into the facility from the Human Resources Department at Eastern. (*Id.*) After the campaign, Lake again removed the styrofoam cups and placed them in a supply closet. (DX 1 at ¶10.)

5

Although she did not openly disagree with some of the changes made during the campaign and went along with her supervisors' decisions, Lake did not agree with some of the directions she received in responding to the union campaign and was perceived to be less than enthusiastic and very resistant to suggestions, recommendations, changes, and discussions regarding any changes. (DX 2 at 108-09; DX 4 at 49-50; DX 3 at 36-37.) Lakeview won the election, but fourteen employees voted for union representation. (DX 2 at 102-03.)

## C.    Addressing Employee Relations Problems After the Campaign

After the union election in March 1997, Mann, Chamblee, and McKelvaine met with Lake to discuss the problems identified in the union campaign and the changes necessary to improve employee relations. (DX 2 at 109-11 and Ex. 2 attached thereto; DX 4 at 48-49, 51 and Ex. 1 attached thereto; DX 5 at 36-37.) During this meeting, Mann reviewed with Lake a list of problems which required improvement and offered Lake assistance in resolving those problems. (*Id.*) The problems were grouped into three categories: physical environment (appearance of the facility and workplace), work environment (policy issues), and employee relations (communication and fair treatment). (DX 1 at ¶ 12; *see also* DX 2 at 110-11 and Ex. 2 attached thereto.)

With regard to the physical environment, Lake was informed that (1) the employee break room lacked adequate windows and heating and air conditioning, and was therefore unusable during summer and winter months; (2) the outdoor patio areas were cluttered with old light fixtures, a washing machine, equipment from a patient's room, and other trash; (3) bulletin boards were cluttered and unkempt with torn and out-of-date postings; (4) notes were posted throughout the facility without any organization; and (5) the employees wanted disposable

6

drinking cups. (DX 3 at ¶ 13; *see also* DX 4 at 43-44, 52-55; DX 5 at 91-92; DX 2 at 113-115.)

With regard to the work environment, Lake was informed that (1) schedules were changed without notice; (2) telephone messages were posted without any concern for privacy; (3) supervisors often failed to timely complete payroll approval for paid time off; (4) supervision for nursing assistants was lacking; and (5) nursing assistants were not exchanging information about their patients at the end of their shifts. (DX 1 at ¶ 14; *see also* DX 4 at 57-61, 79-80; DX 5 at 100-02.)

With regard to employee relations, Lake was informed that the primary issues which arose during the campaign were (1) poor management communication with employees; (2) inconsistent treatment of employees; and (3) remarks by supervisors which were perceived as racist. (DX 1 at ¶ 15; DX 4 at 61-62.) To address these problems, Lake was directed to implement supervisory training, diversity training, regular meetings, a suggestion system and better orientation. (DX 1 at ¶ 15; DX 4 at 65-67, 69-70.) In addition, Lake was directed to post job openings, which she had not done previously. (DX 1 at ¶ 15; DX 5 at 115-16.)

Shortly after giving Lake this list, Chamblee met with Lake to offer assistance in making the necessary changes, but based upon Lake's reaction, Chamblee concluded that Lake was irritated by Chamblee's suggestions and resistant to addressing the fundamental problems. (DX 1 at ¶ 16; DX 3 at 42-44.) Lake expressed to Chamblee her desire to return to managing Lakeview the way she had prior to the campaign. (DX 1 at ¶ 16.)

A month after the union election, Mann concluded that Lake had made little progress in correcting problems, and on April 18, 1997, drafted a memorandum to Lake concerning her failure to adequately address the problems identified after the union election. (DX 5 at 43-45, 48,

59-60 and Ex. 1 attached thereto; *see also* DX 2 at 152-53 and Ex. 5 attached thereto.)  The memorandum noted that even basic issues, such as trash on the patio, had not been corrected. (*Id.*)  Mann delivered the memorandum to Lake on April 21, 1997, and gave her thirty days in which to demonstrate improvement.  (*Id.*)  On that same day, Lake delivered a memorandum to Mann, stating the she was taking time off to have her breast implants replaced.  (PX 1 at 146-48.)

In response to Mann's memorandum, Lake sent Mann a memorandum addressing some of the physical environment and work environment issues, but none of the employee relations issues.  (DX 5 at 53-54 and Ex. 3 attached thereto.)  Lake's response stated, in part: "Schedules are posted in their regular places.  Telephones [*sic*] messages are as usual.  Emergency calls are announced as they occur, others are posted on the bookkeepers [*sic*] door.  Earned Time requests have greatly improved, we will continue the same process for now."  (*Id.*; *see also* DX 4 at 81.)

According to Chamblee, Lake's response demonstrated that she did not understand the nature of many of the problems.  (DX 1 at ¶ 17.)  For example, the problem with schedules was not the place of their posting, but that schedules were changed after they were posted.  (DX 5 at 94-95.)  Likewise, the problem with telephone messages was not simply posting, but that personal messages were posted for the public to read.  (DX 4 at 78-80; DX 5 at 95-98.)  The problem with earned time was the process itself because employees were not receiving their pay for scheduled time off.  (DX 4 at 58-59; DX 5 at 98-99.)

On April 24, 1997, Lake sent a second response to Mann, which did not address the identified problems, but denied responsibility for any of the problems which led to the union campaign.  (DX 2 at Ex. 7.)  Lake further expressed her desire that the facility operate as it had before the campaign: "After the election I had hoped things would return to the pleasant

8

atmosphere as we knew it." (*Id.*)  Lake also requested to meet with Mann on May 5, 1997.  (*Id.*)

On April 28, 1997, the week after she received Mann's memorandum, Lake took off Monday through Thursday to go to a convention at the beach;[3] she then took Friday off to rest after her beach trip.  (PX 1 at 170; DX 1 at ¶ 17; DX 2 at 155-56.)  Lake returned to work for two days the following week, and then took off work until June 2, 1997, for elective surgery (replacing breast implants).[4]  (DX 1 at ¶ 17; DX 2 at 147-52; PX 1 at 171.)  Lake was scheduled to return to work on May 19, 1997, but she extended her absence due to an infection which resulted from the surgery.  (PX 2 at ¶ 8.)  Lake applied for and received family medical leave for the extended absence.  (*Id.*)  Thus, from April 28, 1997, until June 2, 1997, Lake was present at Lakeview for a total of two days.  (PX 2 at ¶ 8; DX 2 at 192-94 and Ex. 13 attached thereto.)

On May 14, 1997, while Lake was out on family medical leave, Mann sent Lake a response at home regarding Lake's previous memoranda and pointing out that Lake had not addressed the more fundamental problems which she had been directed to correct.  (DX 2 at 176-77 and Ex. 9 attached thereto; DX 5 at 74-78 and Ex. 5 attached thereto.)  By May 21, 1997, at the end of the thirty-day period, Lake had made no further progress toward addressing the problems discussed with her in March and according to Mann and Chamblee still did not appear to comprehend the nature or importance of the employee relations problems.  (DX 1 at ¶ 18; DX

---

[3] Lake testified that she needed to attend the conference in order to fulfill the twenty-four hours of continuing education credit before renewing her license in June.  (PX 1 at 171-72; *see also* PX 2 at ¶ 8.)

[4] Lake stated that it was important for her to have the surgery before July 1, 1997, because the company was changing insurance providers and she did not know whether the new company would cover the procedure.  (PX 1 at ¶ 7; *see also* PX 5 at 29.)  Lake further stated that on more than one occasion, she asked Chamblee to check to find out if the new insurance would cover the procedure, but Chamblee never gave her a response.  (PX 1 at ¶ 7.)

5 at 71-72, 85-86.)

On May 28, 1997, after the expiration of the thirty-day period for improvement, Lake, with the help of Evelyn Holmes ("Holmes"), sent Mann another memorandum,[5] for the first time purporting to address all of the identified problems. (PX 1 at Ex. 8 attached thereto.) In management's view, even this memorandum, which came more than two months after the initial meeting, indicated that Lake did not understand and therefore had not corrected many of the problems. (*See id.*) For example, with regard to "language/remarks," the memorandum prepared by Lake and Holmes stated, "I am not aware of no one [sic] has brought to my attention [sic] any remarks made to personnel." (*Id.*) With regard to "communication," Lake and Holmes responded, "[a]ll policies, procedures and or changes are inserviced and signatures required and on file." (*Id.*) In response to the concerns raised about consistent treatment, Lake and Holmes stated, "[p]olicy, used in the past as for consistency, has been to abide by the Employee Handbook." (*Id.*) In response to the request for supervisory training, the memorandum stated:

> I have had no knowledge of any leadership training sessions.  At your suggestion I called Lisa Davis for this information and she had nothing to offer, but referred me to Janet Van Stone, who said there were no leadership training sessions planned at this time but she had a Performance Evaluation Training Workshop scheduled for June 12. This was filled and she had a long waiting list which she added Mrs. Lake['s] and my name.

(*Id.*) With regard to the instruction to provide diversity training, Lake stated, "I am unsure what you mean by this and will await your instructions." (*Id.*)

---

[5] Holmes went to plaintiff's home while plaintiff was on leave to help plaintiff prepare this memorandum. (*See* PX 1 at Ex. 8 attached thereto.) Although both names (Holmes and Lake) appear on the document, it appears that Holmes wrote it and only Holmes signed it. (*Id.*)

Mann and Chamblee determined that Lake's belated response demonstrated that she still did not understand the nature or importance of the problems which had been discussed with her two months earlier. (DX 1 at ¶ 18.) On June 2, 1997, Mann terminated plaintiff because in her opinion she was either unable or unwilling to recognize and address serious management problems at her facility.[6] (DX 1 at ¶ 18; DX 2 at 184-185; DX 3 at 34-37, 42-44; DX 5 at 83-86.)

Lake appealed her termination to the Grievance Committee. (DX 1 at ¶ 19; *see also* DX 3 at 56-60.) The grievance procedure allows employees to have employment decisions reviewed by a three-member panel, in which the employee and his or her supervisor are allowed to select one member of the panel each and to agree on a third member. (DX 1 at ¶ 19.) The Grievance Committee unanimously upheld the termination decision, (*id.*), and recommended that the responsible Vice President keep a closer watch on Lakeview, noting that there "still are environment and behaviors that need to be handled." (DX 3 at 60.)

After Lake's termination, McKelvaine took over the day-to-day responsibilities as Administrator of Lakeview. (PX 3 at ¶ 5; *see also* PX 6 at 87.) On August 18, 1997, after a two month search, Health Services East hired Joyce Campbell ("Campbell"), who was fifty-one years old at the time,[7] to serve as the Administrator of Lakeview. (DX 1 at ¶ 20; DX 5 at 117.)

On October 15, 1997, Lake filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging age and disability discrimination. (PX 1 at Ex. 17 attached thereto.) On March 31, 1999, the EEOC issued a determination, finding that there was

---

[6] Mann gave Lake the option of filling out a letter of resignation, which Lake did. (DX 2 at 185.) However, Lake would have been terminated had she not resigned. (DX 5 at 85.)

[7] Campbell's date of birth is December 14, 1945. (DX 1 at ¶ 20.) Plaintiff was fifty-eight when she was terminated. (PX 1 at Ex. 17.)

reasonable cause to believe that defendants had discriminated against Lake. (PX 6 at Ex. 8 attached thereto.)

In March 1998, nine months after defendants terminated plaintiff's employment, Lakeview voted to unionize. (PX 6 at 105.)

## D.    Plaintiff's Medical Problems

According to Lake, she has a number of health problems which now contribute to her alleged disability, mainly ambulatory problems, hypertension, and stomach disorders. (DX 2 at 32.) During Lake's employment at Lakeview, Lake's hypertension was under control with medication. (*Id.* at 50-51.) During her employment, Lake's stomach disorders involved diverticulosis and irritable bowel syndrome, which she controlled with diet and medication, and neither of which interfered with her normal activities. (*Id.* at 53-64.)

Lake's ambulatory problems arose from degenerative disc and joint disease and arthritis in her back and knees. (PX 1 at 32-40.) She experienced difficulty walking due to pain and swelling. (*Id.* at 35.) Because of her degenerative disk and joint disease, Lake was required to have surgery on both of her knees. (*Id.* at 35-36.) In February of 1994, she had surgery on her lower spine, and in August of 1994, she had a cervical fusion in her neck. (*Id.* at 33-34.) Lake underwent her first knee surgery in 1996.[8] (*Id.* at 35.)

Lake testified that her difficulty with her knees prevents her from walking long distances. (PX 1 at 36-37.) She also testified that she experienced difficulty with walking up and down stairs, (*id.* at 49, 225), and that she began using a walker, cane, or wheelchair as early as 1995,

---

[8] Lake required additional knee surgery in 1999, almost two years after she was terminated. (PX 1 at 35-36.) She anticipates complete knee replacement in both knees. (*Id.* at 225.)

but never used one at work because of her pride, (*id.* at 37-38). Lake's knee problems did not prevent her from performing any aspect of her job, including making rounds throughout the nursing home.[9]  (*Id.* at 38-40.)

In addition to her ambulatory problems, Lake had problems affecting her breasts. (PX 1 at 149-52; PX 2 at ¶ 6.)  In 1986, Lake underwent a double mastectomy.  (PX 2 at ¶ 6.)  As part of the reconstructive surgery, Lake received silicone breast implants.  (*Id.*)  Subsequent to her breast implant surgery, Lake suffered from bilateral neuropathy and fibromyalgia.  (*Id.*)  Because of those illnesses, two doctors recommended that Lake have surgery to replace her silicone breast implants with saline.  (PX 1 at 149-52; PX 2 at ¶ 6.)

The persons involved in Lake's termination, Mann and Chamblee, testified that they were not aware that Lake had any significant difficulty walking.  (PX 5 at 23-26; DX 5 at 26-31.) Lake testified that Mann was aware that she would sometimes drive, rather than walk, to Mann's office, and that Mann would ask if she "was able to walk up there or should she come down to the facility when she wanted to meet with me." (PX 1 at 41-42, 48-49.)  Lake further testified that Mann inquired about Lake's condition to other employees.  (*Id.* at 42-44, 47.)  Lake also testified that Mann was aware that she took time off work for various surgeries, including surgery for her breast implants.  (*Id.* at 43-44, 205-07.)

---

[9]  Lake testified that "[t]here were some things that were hard to do, but [she] did everything that [she] had always done, maybe just not to the same degree," and that she had some difficulty making rounds through the nursing home.  (PX 1 at 38.)

Mitzi Roberts ("Roberts"), another employee of defendant Eastern Health System, Inc.,[10] stated:

> When I worked at Lake Villa, I was aware that Anita Lake suffered from a variety of health conditions.  It was common knowledge that she had surgery on more than one occasion during the course of her employment and that she had difficulty walking.  More than once, Mary Mann specifically remarked to me that Anita Lake missed too much work because of her health problems.  She stated that it was just one illness after another.  In 1997, Mike McKelvaine came in as the Human Resources Manager for Health Services East.  On more than one occasion before Anita Lake was terminated, McKelvaine told me that Anita Lake ran Lakeview Nursing Home fifties style.  Prior to Lake's termination, McKelvaine also told me that the company needed to get younger people in management positions and that the company had too many older people in management positions.

(PX 3 at ¶¶ 3-4.)[11]  Lake testified that Mann also questioned Roberts and Holmes, the Director of Nursing at Lakeview, regarding the scope and prognosis of Lake's medical conditions.  (PX 1 at 42-44.)  Further, Lake testified that Mann told Ann Norsworthy that Lake was terminated because she was off from work too much.  (*Id.* at 44.)

## II.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477

---

[10]  Roberts served as Administrator and Clinical Supervisor at Lake Villa Retirement Facility, which is a sister facility to Lakeview Nursing Home.  (PX 3 at ¶ 1.)  Lake Villa and Lakeview, which are located approximately one block apart, are both operated by Health Services East.  (*Id.*)  Lake and Roberts both reported to Mann.  (*Id.* at ¶ 2.)  On July 21, 1997, Roberts was terminated from her position.  (*Id.* at ¶ 6.)

[11]  There is no evidence, however, that McKelvaine was involved in the decision to terminate Lake; the evidence is undisputed that Lake's supervisor, Mann, recommended the termination and that Chamblee, the Vice President of Human Resources, concurred.  (*See* DX 1 at ¶ 18.)

14

U.S. 317, 322 (1986). The party moving for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III.   ANALYSIS

### A.   ADA Claim

The ADA prohibits "discriminat[ion] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The familiar burden-shifting analysis of Title VII employment discrimination actions is equally applicable to ADA claims. *Hilburn v. Murata Electronics North America*, 181 F.3d 1220, 1226 (11th Cir. 1999). In order to

15

establish a prima facie case under the ADA, a plaintiff must demonstrate that (1) he or she has a disability; (2) he or she is a qualified individual; and (3) he or she was subjected to unlawful discrimination as a result of his or her disability. *See, e.g., Gordon v. E.L. Hamm & Assocs., Inc.,* 100 F.3d 907, 910 (11th Cir. 1996). If a plaintiff fails to do so, the employer is entitled to judgment as a matter of law. *Id.* at 915.

The ADA defines a "qualified individual with a disability" as an "individual with a disability who, with or without accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Under the ADA, "disability" is defined as: (1) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. §§ 12102(2)(A)-(C). "Merely proving the existence of a physical impairment, without addressing any limitation on major life activities, is not sufficient to prove disability under the Act." *Standard v. A.B.E.L. Services, Inc.,* 161 F.3d 1318, 1327 (11th Cir. 1998). As the terms "substantially" and "major" suggest, impairments must be "substantially limiting and significant." *Gordon,* 100 F.3d at 913.

    1.    <u>Actual Disability</u>[12]

The regulations under the ADA clarify that the term "substantially limits" means that an individual is: "(i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner or duration under which [that] individual can perform a particular major life activity as compared to the

---

[12] Although plaintiff alleged that she is actually disabled and was regarded as disabled, plaintiff's counsel conceded at oral argument that plaintiff is really proceeding under the "regarded as" prong with regard to her ADA claim.

16

condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1); *see also Hilburn*, 181 F. 3d at 1226. "Major life activities are defined in the [EEOC] regulations as 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Hilburn,* at 1226-27 (quoting 29 C.F.R. § 1630.2(i) (1997)).

A physical impairment alone is not necessarily a disability under the ADA. *Id.* at 1226. In determining whether an impairment "substantially limits" a major life activity, the Department of Labor regulations implementing the ADA provide that the following factors should be considered: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of the impairment. 29 C.F.R. § 1630.2(j)(2). In addition, according to the ADA's interpretive guidelines, temporary, minor injuries do not "substantially limit" a person's major life activities: "[T]emporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities. Such impairments may include, but are not limited to, broken limbs, sprained joints, concussions, appendicitis, and influenza." 29 C.F.R. § 1630.2(j) App.

Plaintiff contends that she is a person with a disability because she has a physical impairment that substantially limits the major life activity of walking. (Plaintiff's Response in Opposition to Summary Judgment ("Pl.'s Br.") at 11.) Specifically, plaintiff asserts:

> During her employment with the defendants, Lake was substantially limited in the major life activity of walking. Lake testified that, due to her degenerative disk and joint disease and its associated back and knee surgeries, she had extreme pain and swelling in her knees. This pain and swelling prevented her from being able to walk any distance. Moreover, when she had to perform any task which

required her to walk any distance, she utilized a walker or wheelchair. Her inability to walk any distance was demonstrated by her using her car to travel the one block from Lakeview to Lake Villa. She also lacked the ability to climb stairs, which she would avoid at Lake Villa by parking in the handicapped zone and utilizing the back entrance and its elevator. Based upon Lake's testimony and the nature of her degenerative condition, her condition is permanent.

(*Id.*)

The Supreme Court has articulated a three-step inquiry for determining whether an impairment substantially limits a major life activity so as to constitute a disability under the ADA. *See Bragdon v. Abbott*, 524 U.S. 624, 631 (1998). First, the court must ascertain whether plaintiff suffers from a physical or mental "impairment." *See id.* The court must then identify whether the life activity purportedly impacted by that impairment is a "major life activity." *See id.* Finally, the court must determine whether the claimed impairment "substantially limits" that major life activity. *See id.*

In this case, plaintiff's knee problems[13] present a physical impairment.[14] Further,

---

[13] Plaintiff testified that the other two categories of health problems from which she suffered, hypertension and stomach disorders, were under control during her employment and did not interfere with her normal activities, and that "the main problem I have is with my back and knees." (DX 2 at 50, 56-57, 59-63, 66.) The Supreme Court has concluded:

Looking at the Act as a whole, it is apparent that if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures--both positive and negative--must be taken into account when judging whether that person is "substantially limited" in a major life activity and thus "disabled" under the Act.

*See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999); *see also Murphy v. United Parcel Service*, 527 U.S. 516 (1999). Based on the evidence before the court and the holdings of these two cases, the court concludes that plaintiff's hypertension and stomach disorders, do not constitute substantial impairments.

[14] The court notes that the ADA does not define the term "impairment." However, the EEOC has promulgated regulations upon which the court may rely for guidance in interpreting

18

plaintiff's alleged condition affects the major life activity of walking.  Thus, the issue in this case is whether plaintiff's impairment *substantially limits* plaintiff's major life activity of walking. *See Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000).

A number of cases have held that mere difficulty walking is insufficient to establish a disability.  *See, e.g., Talk v. Delta Air Lines, Inc.*, 165 F.3d 1021, 1025 (5th Cir. 1999) (finding no disability where plaintiff walked with a limp, moved at a slower pace than the average person, and had additional difficulty walking in cold temperatures because her right leg was shorter than her left leg); *Doren v. Battle Creek Health System*, 187 F.3d 595, 596, 599 (6th Cir. 1999) (finding no disability where plaintiff experienced joint pain, swelling, and fatigue due to recurrent tendinitis in multiple joints, chondromalacia of both knees, sub-patellar crepitus and pain, fascitis of both feet, low back radiculopathy, and a gastric ulcer that prohibited her from taking aspirin or Tylenol to relieve the pain.); *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 183, 185-187 (3rd Cir. 1999) (plaintiff with a permanent ankle impairment of sixteen percent who walked with a slight limp, required a ten-minute sitting break for every fifty minutes he stood or walked, and required ameliorative footwear was not substantially limited in the major life activity of walking or standing and was thus not disabled under ADA); *Penny v. United Parcel Service*, 128 F.3d 408, 415 (6th Cir. 1997) (plaintiff who injured his back and shoulder in three separate incidents over a three-year period was not substantially limited in the major life

---

the ADA.  *See Gordon*, 100 F.3d at 911 (courts may seek direction from EEOC regulations implementing Title I of the ADA).  Those regulations define a "physical impairment" as a "physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine."  *Id.* at 911 n.2 (citing 29 C.F.R. § 1630.2(h)(1) (1998)).  Thus, plaintiff's alleged condition qualifies as a physical impairment.

activity of walking and was thus not disabled under ADA in light of his testimony that "he was able to go fishing and hunt rabbits, squirrels, pheasant, and deer" as well as "fulfill his job duties in a relatively satisfactory manner (which required a substantial amount of walking) during the period when his ability to walk allegedly was substantially impaired."); *Kelly v. Drexel University*, 94 F.3d 102, 106 (3rd Cir. 1996) (finding no disability where plaintiff could not walk long distances, had difficulty climbing stairs, and his treating physician stated that "[t]he patient's condition causes him great difficulty in walking around."); *Williamson v. International Paper Co.,* 85 F. Supp. 2d 1184, 1192-93 (S.D. Ala. 2000) (finding no disability where plaintiff testified that he could not walk more than a mile, occasionally had difficulty walking due to neuropathy, and needed to take frequent breaks and eat every two hours); *United States Equal Employment Opportunity Commission v. Sears, Roebuck and Co.*, No. 97 C 3971, 1999 WL 977072 (N.D. Ill. October 22, 1999) (diabetic plaintiff who suffered from neuropathy was not substantially limited in the major life activity of walking and was thus not disabled under ADA in light of evidence that she could stand and walk around the sales floor for five to six hours at a time without the use of her cane and "was still able to go shopping at the end of her shift with the use of her cane."); *Nedder v. Rivier College*, 944 F. Supp. 111, 116-17 (D. N.H. 1996) (finding no disability based upon difficulty walking more than 500 yards even though walking required considerable exertion and she could not walk as swiftly as the average person); *Stone v. Entergy Services*, No. 94-2669, 1995 WL 368473, at *3-4 (E.D. La. June 20, 1995) (finding that plaintiff with partial paralysis, muscle weakness, and uneven legs as residual effects of polio who testified that he had limited endurance, experienced difficulty climbing stairs, and walked significantly slower than the average person was not substantially limited in ability to walk); *Graver v.*

20

*National Eng'g Co.*, No. 94 C 1228, 1995 WL 443944, at \*10-11 (N.D. Ill. July 25, 1995) (holding that a plaintiff with a pronounced limp, who suffered from ankle problems causing significant pain when walking, was not disabled).[15]

Here, plaintiff's evidence of the extent of the alleged limitation on her ability to walk is minimal. Lake testified that she had difficulty walking long distances, although she does not specify how far she could walk, and that she experienced some pain and discomfort. (*See* PX 1 at 32-40.) Further, plaintiff admitted that she was able to walk sufficiently to perform her rounds throughout the nursing home. (*Id.* at 38-40.) Although plaintiff experiences some limitation in her ability walk, upon review of the cases cited above and the evidence presented as to the extent of plaintiff's impairment, the court is of the opinion that her impairment does not rise to the level of a substantial impairment. Accordingly, the court concludes that there is insufficient evidence from which a reasonable juror could find that plaintiff was substantially limited in the major life activity of walking and thus disabled under the ADA.

Moreover, in order to survive summary judgment, a plaintiff must offer affirmative evidence that she is "significantly restricted" in a major life activity as compared to the "average person in the general population." *See* 29 C.F.R. § 1630.2(j)(1)(ii); *see also Lusk v. Ryder Integrated Logistics*, 238 F.3d 1237, 1240-41 (10th Cir. 2001) (evidence that doctor

---

[15] Plaintiff cites *Talavera v. School Board of Palm Beach County*, 129 F.3d 1214 (11th Cir. 1997) for the proposition that a plaintiff may create a question of fact on the issue of "qualified individual with a disability," where the plaintiff could not stand for more than five minutes or walk more than 100 feet. Plaintiff's reliance on *Talavera*, however, is misplaced. In *Talavera*, the court only considered whether the plaintiff was qualified for her job based upon her limitations, not whether her condition was a disability under the ADA. *Id.* at 1221. The court did not address at all whether the plaintiff's limitations would qualify as a disability under the ADA.

recommended a permanent forty pound permanent lifting restriction due to a heart condition did not establish that plaintiff was substantially limited in the major life activity of lifting, absent evidence of any substantial limitations on his day-to-day activities or the long-term impact of his restriction, or comparative evidence as to the general population's lifting capabilities); *Gibbs v. St. Anthony Hospital,* No. 96-6063, 1997 WL 57156, at *2 (10th Cir. Feb. 12, 1997) (holding that because the evidence established "nothing about the capabilities of the average person to allow a comparison," plaintiff's evidence was "insufficient to show she is substantially limited in the major life activity of lifting"); *Huizenga v. Elkay Mfg.,* No. 99 C 50287, 2001 WL 640973, at * 6 (N.D. Ill. June 5, 2001) (Plaintiff "must do more than merely provide evidence of his own limitations at that time; instead, he has the burden to present sufficient 'comparator evidence' to show he is 'significantly restricted' as compared to the 'average person in the general population.'. . . "If [plaintiff] does not produce such 'comparator evidence,' he must, at the least, provide enough specifics about his disability so the fact finder is not left speculating about how substantial his limitations really are compared to the 'average person.'"); *DeMar v. Car Freshner Corp.,* 49 F. Supp. 2d 84, 91 (N.D. N.Y. 1999) ("Significantly, Plaintiff has failed to offer any proof as to how his ability to concentrate compares with that of the average person. . . . Here, Plaintiff merely alleges, in conclusory fashion, that as compared to the average person, his ADHD 'restricts his ability to screen out distractions . . . which make it more difficult . . . for him to concentrate.' . . . Notably absent from Plaintiff's allegations are specific facts or evidence demonstrating that Plaintiff is substantially limited in his ability to concentrate in comparison to the general population.  However, neither 'conclusory statements, conjecture, [n]or speculation' suffices to defeat summary judgment."); *cf. Ward v. Wal-Mart Stores, Inc.,* 140 F. Supp. 2d 1220,

1225 (D. N. Mex. 2001) ("The Court concludes that this impairment is substantially limiting on its face. [Plaintiff's] overhead lifting restriction is, for all intents and purposes, absolute: comparative evidence is unnecessary to establish that [plaintiff] is significantly restricted in his ability to lift as compared to the average person in the general population. Thus, [plaintiff] has created a genuine issue of material fact as to whether his impairment substantially limits his ability to lift.").[16]

In this case, Lake has offered only ambiguous evidence of her own limitations and no evidence that she is significantly limited relative to the average person. Because plaintiff's impairment is not substantially limiting on its face, and because plaintiff failed to offer any comparative evidence, plaintiff has failed to show that she has an actual disability under the ADA.

### 2. Regarded as Disabled

Plaintiff alleges that she was "regarded as" substantially impaired in the major life activities of walking and working. (*See* Pl.'s Br. at 12-14.) An individual may invoke this statutory definition of "regarded as" disabled by showing that he or she: (1) has an impairment

---

[16] In *Maynard v. Pneumatic Products Corp.*, 233 F.3d 1344, 1349-50 (11th Cir. 2000), the Eleventh Circuit described an ADA plaintiff's burden: "An ADA complainant who alleges that an impairment significantly restricts the performance of a major life activity must present some evidence of how well the average person in the general population performs the major life activity in question." In *Maynard*, the plaintiff testified that he could not walk more than forty to fifty yards, but offered no proof of how far the average person could walk. *Id.* at 1348. The Eleventh Circuit affirmed summary judgment based upon the plaintiff's failure to present the comparative evidence necessary to establish a prima facie case. *Id.* at 1349. However, the Eleventh Circuit vacated this Opinion on July 12, 2001, upon *sua sponte* reconsideration, and substituted it with an Opinion affirming the district court's decision on the basis that the plaintiff failed to prove that he timely filed his EEOC charge. *See Maynard v. Pneumatic Products Corp.*, No. 99-12881, 2000 WL 792349 (11th Cir. July 12, 2001.) The court did not address the comparative evidence issue in the second opinion.

that does not substantially limit a major life activity, but is treated by an employer as though it does; (2) has an impairment that limits a major life activity only because of others' attitudes towards the impairment; or (3) has no impairment whatsoever, but is treated by an employer as having a disability as recognized by the ADA. *Standard,* 161 F.3d at 1327 n.2 (citing 29 C.F.R. § 1630.2(l)). In any case, "it is necessary that a covered entity entertain misperceptions about the individual – it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton,* 527 U.S. at 489.

Plaintiff contends that Mann and Chamblee "regarded" her as disabled. (*See* Pl.'s Br. at 12-14.) Lake, however, only offers evidence that Mann and Chamblee were aware that she had some medical problems, not that they believed that she was significantly restricted in any major life activity. "The mere fact an employer is aware of an employee's impairment is insufficient to demonstrate that the employer regarded the employee as disabled." *Sutton v. Lader*, 185 F.3d 1203, 1209 (11th Cir. 1999). "In order for a plaintiff to prevail on a perception theory of disability discrimination, he must be able to show that, as with a real impairment, the perceived impairment is substantially limiting and significant." *Id.* at 1208.

### a.   Walking

Lake has presented no evidence that either Chamblee or Mann believed that plaintiff was significantly restricted in walking relative to the general population. Not only did Lake perform all of her usual functions at work, she avoided using walking aids at work because of her "pride." (*See* PX 1 at 32-40.) Consequently, Chamblee testified, "[a]lthough I was aware that [Lake],

24

like me, had difficulties with her knees, I was not aware that these difficulties limited her activities in any significant way or were any more severe than mine." (DX 1 at ¶ 21; *see also* PX 5 at 23-26.) Likewise, Mann testified that she would be surprised to know that Lake had serious difficulty walking because she regularly wore high heel shoes. (*See* DX 5 at 26-31.) Although Lake testified that Mann would offer to come to her facility to meet and she would sometimes drive to Mann's facility, (PX 1 at 41-42), neither of these facts establish that Mann believed that plaintiff had a disability, (*see* DX 5 at 26). Further, Mann's alleged inquiries into Lake's health condition does not show that Mann regarded Lake as substantially limited in the activity of walking.

The evidence shows that Chamblee and Mann were aware that Lake had medical problems. However, Lake has not presented any evidence showing that either Chamblee or Mann thought that plaintiff was significantly limited in walking as compared to the general population. "Where the recognition of plaintiff's limitations is not an erroneous perception, but is instead a recognition of fact, a finding that plaintiff was regarded as disabled is inappropriate." *Lusk,* 238 F.3d at 1241 (citing *Hilburn,* 181 F.3d at 1230). Further, "For an employee to be disabled under the [perceived disability prong of the ADA], it is not sufficient that an employer perceive an employee as having an impairment; the employer must regard the employee as having an impairment that significantly limits a major life activity." *Weber v. Strippit, Inc.,* 186 F.3d 907, 915 (8th Cir. 1999) (quoting *O'Keefe v. Varian Assocs., Inc.*, No. 95-C 4281, 1998 WL 417498, at *18 (N.D. Ill. 1998)). Plaintiff's evidence merely shows that Mann and Chamblee knew that plaintiff had trouble with her knees which caused some impairment in her ability to

walk. The record contains no evidence that defendants misperceived the extent of plaintiff's limitation regarding her ability to walk. Thus, the court is of the opinion that plaintiff has not produced evidence on which a reasonable jury could conclude that defendants "regarded" plaintiff as being substantially limited in her ability to walk.

### b. *Working*

Further, in addressing the major life activity of working, "the [EEOC] defines 'substantially limits' as: 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.'" *Murphy*, 527 U.S. at 523 (quoting 29 C.F.R. § 1630.2(j)(3)(i) (1998)). To be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job. *Id.* Consequently, when a plaintiff claims that she is "regarded as" disabled as to the major life activity of working, the statutory phrase "substantially limits" requires the plaintiff to allege that she is regarded as being significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes. *Sutton*, 527 U.S. at 491; *see also Gordon*, 100 F.3d at 913 ("As with real impairments, courts have held that a perceived impairment must be substantially limiting and significant. In this context, then, a significant impairment is one that is viewed by the employer as generally foreclosing the type of employment involved, not just a narrow range of job tasks.").

Plaintiff alleges that "Mann's continued questions and concerns regarding Lake's health taken in conjunction with Mann's actions related to Lake's medical leave indicate that she regarded her as substantially limited in her ability to work." (Pl.'s Br. at 13.) Such evidence is

26

insufficient to establish that plaintiff was regarded as substantially limited in her ability to work.

Mann's inquiry into and recognition of plaintiff's health and attendance history does not support

plaintiff's argument that she was subjected to unlawful discriminatory decisions by defendants

because of a perceived disability.  Plaintiff has failed to offer sufficient evidence establishing that

defendants' perception of her health condition was inaccurate.[17]  Where a "defendant's

recognition of plaintiff's limitations was not an erroneous perception, but instead was a

recognition of a fact," *see McCollough v. Atlanta Beverage Co.*, 929 F. Supp. 1489, 1498 (N.D.

Ga. 1996), "a finding that plaintiff was regarded as disabled and, therefore, [is] entitled to the

protections of the ADA[,] is inappropriate," *Bute v. Schuller Int'l Inc.*, 998 F. Supp. 1473, 1477

(N.D. Ga. 1998).  Therefore, the court is of the opinion that plaintiff has not produced evidence

on which a reasonable jury could conclude that she was perceived as being significantly restricted

in the ability to perform either a class of jobs or a broad range of jobs in various classes.

    3.    <u>Conclusion</u>

        The court is of the opinion that plaintiff has not produced evidence on which a reasonable

jury could conclude that plaintiff was substantially limited in a major life activity or that

defendants "regarded" plaintiff as having an impairment that substantially limited a major life

activity.  Therefore, plaintiff has failed to state a prima facie case under the ADA.

---

[17] The only evidence of a misperception is Mann's inquiry as to whether plaintiff had cancer.  (*See* PX 1 at 206.)  However, plaintiff could not remember when this conversation occurred, although she stated that it did not occur in 1997.  (*Id.*)  Further, plaintiff responded that she did not have cancer, and plaintiff knows of no other occasion on which Mann inquired about cancer.  (*Id.* at 206-07.)

**B.     ADEA Claim**

For suits under the ADEA, the Eleventh Circuit has adopted the principles that govern the order and allocation of proof in cases under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e-17.  To evaluate ADEA claims based on circumstantial evidence, this court must use the framework established in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 140 (2000).  In *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428 (11th Cir.1998), the court specifically addressed the applicable standard when a plaintiff attempts to use circumstantial evidence to establish unlawful discrimination under the ADEA. The court stated:

> The plaintiff must establish a prima facie case of discrimination.  The employer then must respond with a legitimate, nondiscriminatory reason for its actions.  In order to prevail, the plaintiff must establish that the employer's articulated legitimate reason was a pretext to mask unlawful discrimination.

*Turlington*, 135 F.3d at 1432 (citing *Walker v. NationsBank of Fla., N.A.*, 53 F.3d 1548, 1556 (11th Cir. 1995)).  The employer's burden is one of production, not persuasion; the ultimate burden of persuasion remains at all times with the plaintiff.  *Watkins v. Sverdryup Technology, Inc.*, 153 F.3d 1308, 1314 (11th Cir. 1998).

To establish a prima facie case under the ADEA, plaintiff must show: (1) she was a member of the protected group (age), (2) she was subjected to an adverse employment action, (3) she was qualified for the job, and (4) she was replaced or otherwise lost a position to a younger individual.  *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207-08 (11th Cir. 1997); *see also O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996) ("Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is

28

substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class.").[18]

Assuming a prima facie case, defendants have articulated its legitimate, non-discriminatory reason for Lake's termination: Lake failed to correct serious management problems at her facility after being directed to do so. (DX 1 at ¶ 18; DX 2 at 83, 85-86; DX 3 at 34-37, 42-44.) Thus, defendants have satisfied their burden of coming forward with a legitimate nondiscriminatory reason for their actions. *See, e.g., Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) (concluding that poor performance and insubordination were legitimate nondiscriminatory reasons for employer's action); *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) (holding that an employer's good faith belief that an employee's performance is unsatisfactory is a legitimate, nondiscriminatory reason for an adverse employment action).

Plaintiff has failed to produce any evidence raising a genuine issue of fact as to pretext. Lake does not dispute that her employees complained during the union campaign about a host of problems regarding the way they were treated at her facility. Nor does she deny that in March of 1997, and again in April of 1997, Mann instructed her to address twenty-one areas of concern at

---

[18] The Eleventh Circuit has noted:

> [A] plaintiff seeking to establish a prima facie case under the ADEA must show only that he was qualified to do the job for which he was rejected, *see Jameson v. Arrow Co.*, 75 F.3d 1528, 1531 (11th Cir. 1996), and, unlike a Title VII plaintiff, need not show that a person outside of the plaintiff's class with equal or lesser qualifications received the job, *cf. Roberts v. Gadsden Mem'l Hosp.*, 835 F.2d 793, 796 (11th Cir. 1988) (Title VII case), amended by 850 F.2d 1549 (1988).

*Turlington*, 135 F.3d at 1433.

Lakeview, areas which had been identified as problems during the union campaign.  The

evidence further establishes that Chamblee met with plaintiff shortly after the March 1997,

directive and offered her assistance with the problems, but was met with resistance, (DX 1 at ¶

16; DX 3 at 42-44), and that as late as April 18, 1997, plaintiff had not corrected even minor

items, such as trash on the patio, (*see* DX 5 at 43-45, 48, 59-60 and Ex. 1 attached thereto).

Mann then instructed plaintiff to address the previously-identified problems within thirty days.

(*See id.*; *see also* DX 1 at ¶ 16.)

Lake's pretext argument is simply that she attempted to respond to the issues, with three

memoranda, but that she was given inadequate time to correct the problems.  (*See* Pl.'s Br. at 15-

18.)  However, defendants contend that these memoranda demonstrate the shortcomings of her

response and the source of defendants' dissatisfaction.  On April 22, 1997, Lake wrote a

memorandum in response to Mann's April 18, 1997, directive that she correct the problems

within thirty days.  (*See* DX 5 at 43-45, 48, 53-54, 59-60 and Ex. 1 & 3 attached thereto.)  Her

response was that four of the six physical environment issues had been or would be fixed, that

she would make changes to two of the five procedural issues, and that the remaining three

procedural issues would stay the same.  (*See* DX 5 at Ex. 3 attached thereto.)  Lake did not

address any of the ten employee relations issues in her memorandum dated April 22, 1997.  (*Id.*)

On April 24, 1997, Lake again responded to  Mann's directive, but this time did not address any

of the problems which had been identified in March.  (DX 2 at Ex. 7 attached thereto.)  In this

response, Lake simply argued that the problems were not her fault.  (*Id.*)  On May 28, 1997, more

than two months after being given the initial directive and more forty days after being instructed

30

to correct the problems within thirty days, Lake, through Holmes, the Director of Nursing, responded with another memorandum. (PX 1 at Ex. 8 attached thereto.)  While the memorandum mentioned each of the problems identified, it did not purport to resolve each problem or even propose a plan of action for each problem. (*See id.*)

During the thirty day period for improvement, Lake's only substantive response was that six of the twenty-one problem areas would be corrected, three would stay the same, and the remaining twelve issues were not addressed. (*See* DX 5 at Ex. 3 attached thereto; *see also* DX 1 at ¶ 17.)  Thus, plaintiff's supervisors were of the opinion that even after the time for improvement expired, Lake's responses indicated that she did not understand the nature of many problems and admitted that she was "not aware" or was "unsure what she meant" by several of the problems. (*See* PX 1 at Ex. 8 attached thereto.)  Therefore, Mann decided to terminate plaintiff's employment, based upon plaintiff's failure to correct, or even grasp, the problems. (*See* DX 1 at ¶ 18.)

Defendants assert that Lake's own memoranda support defendants' nondiscriminatory reason for her termination, her failure to comprehend or completely respond to identified areas for improvement.  Rather than meeting defendants' reasoning "head on and rebutting it," *see Chapman v. A.I. Transport,* 229 F.3d 1012, 1030 (11th Cir. 2000), Lake instead argues that she made an effort to correct some of the problems and that she needed more time, (*see* Pl.'s Br. at 15-18).  Both of these responses are attempts to second guess the wisdom of defendants' business judgment -- that the Administrator needed to respond promptly to all of the employee concerns --

31

and do not establish pretext.[19] *See Chapman*, 229 F.2d at 1030.  A court does "not sit as a super-personnel department that reexamines an entity's business decisions." *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1501 (11th Cir. 1991) (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)).  Courts "are not in the business of adjudging whether employment decisions are prudent or fair.  Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).  Thus, Lake "must do more than challenge the judgment of [her] superiors through [her] own self-interested assertions." *Dale*, 797 F.2d at 464.  Plaintiff's perception of herself is not relevant. *See id.*  "It is the perception of the decision maker which is relevant." *Id.* (citing *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980)).  Plaintiff has not made a sufficient showing to establish that her superiors' negative assessments of her were motivated by age discrimination.

As further evidence of pretext, plaintiff points to the statement attributed to McKelvaine, that the company needed to get younger people in management positions. (*See* Pl.'s Br. at 16-18.)  The court, however, has not been directed to any evidence that McKelvaine participated in the decision to terminate Lake's employment.  The uncontroverted evidence is that Mann made the decision and Chamblee concurred. (*See* DX 1 at ¶ 18; DX 2 at 184-185; DX 3 at 34-37, 42-44; DX 5 at 83-86.)  The statement attributed to McKelvaine is therefore not relevant. *See Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323, *modifying* 137 F.3d 1321 (11th Cir. 1998) (concluding that racial statements did "not amount to direct evidence of discriminatory

---

[19] Plaintiff does not dispute defendants' contention that she failed to comprehend many issues and failed to address the more significant problems.

conduct. . . . And as circumstantial evidence, the statements [were] not enough to establish a

prima facie case [because] they were not associated with the events of the day leading to

Plaintiff's discharge"); *Holifield*, 115 F.3d at 1563-64 ("The biases of one who neither makes nor

influences the challenged personnel decision are not probative in an employment discrimination

case.").

      Finally, plaintiff attempts to rely on an EEOC determination letter, which does not offer

any significant basis for the letter's conclusion, (*see* Pl.'s Br. at 18-19), as evidence of pretext.

The EEOC letter states that Lake "is a qualified individual with a disability and/or has a record of

a disability," (PX 6 at Ex. 6 attached thereto), but does not state how the EEOC reached this

conclusion or even what the disability was.  Likewise, the EEOC concluded that Lake was

discharged because of her age and disability without any explanation as to how this conclusion

was reached.  (*See id.*; *see also* PX 6 at Ex. 8 attached thereto.)  As other courts have noted, it is

the judiciary's role to determine whether there is a genuine issue of material fact.  *See Coleman*

*v. Quaker Oats Co.*, 232 F.3d 1271, 1284 (9th Cir. 2000) ("a conclusory EEOC reasonable cause

letter, at least by itself, does not create an issue of material fact"); *Simms v. Oklahoma*, 165 F.3d

1321, 1331 (10th Cir. 1999) ("[W]hen the independent facts before the district court judge fail to

establish a genuine issue of material fact, a favorable EEOC letter of determination does not

create one."); *Williams v. Alabama Indus. Dev't Tr'g,* No. 00-D-544-N, 2001 WL 708549, at *7

(M.D. Ala. May 4, 2001) (noting that the court could not determine what evidence the

investigator considered before making his findings, but the reasonable cause letter suggests that

the EEOC was not fully informed. . .")*; Bynum v. Fort Worth Indep. Sch. Dist.*, 41 F. Supp. 2d

33

641, 658 (N.D. Tex. 1999) (finding that the EEOC's determination may be considered to see "if the EEOC had evidence of discrimination that was not in the summary judgment record," but "not as primary evidence of the truth of the contents of the record"). The court has reviewed the EEOC's determination letter, as well as the evidence submitted by the parties, and finds that the conclusions contained in the EEOC letter do not present a sufficient basis for denying summary judgment.

The court is of the opinion that plaintiff has not presented significantly probative evidence to meet her burden of establishing pretext, and she has not produced sufficient evidence upon which a reasonable juror could infer that she was subjected to discrimination based upon her age. Therefore, defendants are entitled to judgment as a matter of law as to this claim.

**D.      Back Pay**

Defendants also move for summary judgment on plaintiff's claim for back pay based upon her failure to seek any employment after her termination. Because of the disposition of the ADA and ADEA claims, the court need not address the back pay claim.

**IV. CONCLUSION**

Based upon the foregoing, the court finds that Defendants' Motion for Summary Judgment is due to be granted. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this _3rd_ day of August, 2001.

Sharon Lovelace Blackburn
**SHARON LOVELACE BLACKBURN**
United States District Judge

34